## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EUGENE MCCAIN,

      Plaintiff,

    v.                                            Case No. 16-10112

ST. CLAIR COUNTY, et al.,

      Defendants.

                                  /

### OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Eugene McCain brings this action for damages under 42 U.S.C. § 1983, claiming violations of his rights under the Eighth and Fourteenth Amendments stemming from two seizures he suffered while awaiting trial in the St. Clair County Jail. (*See* Dkt. # 4.) Before the court are two motions for summary judgment: one (Dkt. # 63) filed by Defendants Kimberly King, Brandy Scheimen, and Amanda Bishop, all licensed practical nurses ("LPNs") (collectively "Defendant LPNs"); the other (Dkt. # 65) filed by Defendants Sergeant Richard Olejnik, Deputy Matthew Methany, Deputy Brandon Rogers, Deputy Brook Schmidt, Deputy Ryan Kacafirek, and Deputy Richard Kaminsky (collectively "Defendant Officers") and St. Clair County.[1] Defendant LPNs' motion is fully briefed. (Dkt. ## 63, 71, 75.) Plaintiff filed a response (Dkt. # 72) to the motion by Defendant Officers and St. Clair County, to which those defendants replied (Dkt. # 77). The parties then stipulated to allowing Plaintiff to file an amended response, which he did on June 1, 2017. (Dkt. # 80.) Defendants have declined to reply to the amended

---

[1] Several other Defendants joined in the motions, but have since been dismissed by stipulation. (*See* Dkt. ## 67, 68, 79.) The court will ignore those former defendants for the purposes of this motion.

response. After reviewing the extensive briefing, and with the benefit of a hearing held July 12, 2017, the court will grant both motions.

## I.   BACKGROUND

The following facts are undisputed unless otherwise noted. On Saturday, March 2, 2013, Plaintiff was arrested and brought to the St. Clair County Jail for booking. He was booked at 10:25 p.m. (Dkt. # 71-14.) Defendant Sheriff's Deputy Methany did the intake and filled out a medical screening form for Plaintiff. (Dkt. # 71-1, Pg. ID 1180.) On that form, Deputy Methany noted that Plaintiff answered "yes" to questions regarding epilepsy and seizure disorder, noted that Plaintiff was taking Tegretol for the condition, and that he had last taken his medication at 4 p.m. that day. (*Id.* at Pg. ID 1181.) Plaintiff had his medication on him at the time he was arrested, but the arresting officer told him he would not be able to bring it into the jail, so he left it with his mother. (Dkt. # 65-2, Pg. ID 738-39.)

Deputy Methany also indicated that Plaintiff's prescription was from "Family Pharmacy." (*Id.*). In fact, Plaintiff did not have a prescription with Family Pharmacy— though had been filling a prescription for Tegretol at a pharmacy called "Blue Water Pharmacy" and had last filled a 30-day supply on January 25, 2013. (Dkt. # 65-46.)

After filling out the intake form, Deputy Methany placed the form in a metal bin for the medical personnel to pick up. (*Id.* at Pg. ID 1185.) It was the regular practice of the jail nurses to go down to the assessment area multiple times per shift to pick up the medical screening forms from this basket. (Dkt. # 71-12, Pg. ID 1464; Dkt. # 71-3, Pg. ID 1261.) The nurse would then attempt to verify the medication by contacting the listed pharmacy. If the pharmacy verifies the prescription, the nurse is allowed to order the

medications. (Dkt. # 65, Pg. ID 684; Dkt. # 80, Pg. ID 1820.) Otherwise, the nurses must consult with the doctor on call to order prescriptions, as the nurses are not allowed to prescribe medication.

Defendant Nurse Bishop was on duty at the time Plaintiff was booked, working the 7 p.m. to 7 a.m. shift. Nurse Bishop cannot recall the events of March 2, 2013 due to the passage of time. (Dkt. # 65, Pg. ID 683; Dkt. # 80, Pg. ID 1820.) Nobody involved recalls when the medical screening form was picked up, and Nurse Bishop could not recall if she had ever seen the form or spoken to Plaintiff (Dkt. # 65-24, Pg. ID 915-17). Nurse Bishop did not order Plaintiff's medication before the end of her shift.

There is no evidence that Plaintiff made any follow-up requests for medication, submitted a medical request or "kite," or filed a grievance over not receiving his medication after being placed in a holding cell. (Dkt. # 65, Pg. ID 686; Dkt. # 80, Pg. ID 1821.) There is no evidence in the record as to which nurse was on duty for the 7 a.m. to 7 p.m. shift the following day, March 3. Nurse Bishop again worked the 7 p.m. to 7 a.m. shift from March 3 to March 4. Plaintiff's medication was not ordered on March 3, and the record is silent as to whether anyone attempted to verify his medication.

At approximately 5:30 in the morning of Monday, March 4, 2013, Plaintiff had a seizure while in "9 cell[,]" which he shared with several other inmates. (*See* Dkt. # 65-22.) A video of the incident depicts the activities in the cell prior to and during the seizure. The video shows breakfast being served to the inmates, Plaintiff taking food from another inmate's breakfast tray, and then laying down along with the other inmates to return to sleep. Plaintiff then begins to seize, and once the other inmates notice they

begin banging on the glass wall of the cell. This occurred at approximately 6:25 or 6:30 a.m.[2]

As shown on the video and uncontested by the parties, Defendant Deputy Rogers was the first to respond, arriving at the cell approximately 48 seconds after the inmates began to summon help. Defendants Deputy Kaminsky, Deputy Methany, Deputy Kacifirek, and Sgt. Olejnik arrived shortly after to provide assistance, as did Sgt. Labeau, who is not a defendant. (Dkt. # 65-22, Pg. ID 985.) The cellmates were removed from the cell less than 30 seconds later and Defendant Nurse Bishop, summoned by Deputy Rogers, appeared slightly more than one minute after Deputy Rogers and provides first aid to Plaintiff. The deputies assisted with securing Plaintiff, who was flailing his arms and legs and, when instructed by Nurse Bishop, turned Plaintiff on his left side. (*See* Dkt. # 65-22.)

After Nurse Bishop determined that Plaintiff was able to move on his own, open his eyes, and understand his surroundings, she ordered that Plaintiff be placed on "30 minute rounds" in "5 cell," which is a glass-walled cell near the officer's desk in the assessment area. (Dkt. ## 65-25, 65-49.) Nurse Bishop did not check McCain's vitals, consult a doctor, or do anything to expedite the process of getting Plaintiff's anti-seizure medication. Someone—at least some evidence suggests that it was Nurse Bishop— then ordered the medication, and apparently signed the relevant authorization as Dr. Stromberg, the jail doctor, who was then on vacation and had not been consulted. (Dkt. # 71-4, Pg. ID 1309.)

---

[2] The parties agree that the time stamp on the video is incorrect—between 46 and 52 minutes slow. (Dkt. # 65, Pg. ID 687; Dkt. # 72, Pg. ID 1509.)

An inmate placed on 30-minute rounds is visually observed regularly by the corrections deputies to monitor for any distress. (Dkt. # 65-39.) Between 7:00 a.m. and 2:00 p.m., Plaintiff was observed approximately every 30 minutes by either Deputy Shane Walker or Deputy Jonathan Lembas, who are no longer Defendants in this action. (Dkt. # 65-50.)

Advanced Care Pharmacy opened the prescription request at approximately 8:54 a.m. that morning, and filled Plaintiff's Tegretol prescription at 10:17 a.m., along with several other inmate prescriptions. (*See* Dkt. # 65-37, Pg. ID 1027, 1029.) The medication was delivered to the jail at approximately 11:05 a.m. on March 4, 2014. (*Id.* at Pg. ID 1029.) The next medication pass in the assessment area was to take place around 3:00 p.m. (Dkt. # 65-26, Pg. ID 934.)

Plaintiff was arraigned by video conferencing between 1:43 and 1:46 p.m. He was informed he could face up to life in prison as a repeat offender, and his bond was set at $15,000. While making his 30-minute rounds at 2 p.m.,[3] Deputy Walker observed Plaintiff sitting by the phones next to 5 Cell. (Dkt. # 65-23, Pg. ID 902; Dkt. # 65-20, Pg. ID 883-84.) Deputy Walker asked Plaintiff if he was okay, and Plaintiff responded "yes, my bond is just a lot[.]" (Dkt. # 65-23, Pg. ID 902.) Deputy Walker then returned to assessment office work area. (*Id.*)

After Deputy Walker returned to the officer work area, he noticed Plaintiff stand up near the phone. Plaintiff "did not appear to be acting normal" and looked like "he was having a tough time maintaining his balance[.]" (Dkt. # 65-23.) Deputy Walker then

---

[3] The parties agree that Deputy Walker's incident report (Dkt. # 65-23) incorrectly identifies the time at 3 p.m., the time stamp on the video is approximately 48 minutes slow, and that the correct time is approximately 2 p.m. (Dkt. # 65, Pg. ID 690; Dkt. # 80, Pg. ID 1822.)

advised Plaintiff to have a seat in the chairs in a front of a television used by inmates in a carpeted portion of the assessment area, which Plaintiff did. (*Id.*) Walker left the officer workstation to attend to Plaintiff. (*Id.*)

Deputy Walker then noticed that Plaintiff was sweating profusely and not responding to questions, so he summoned medical staff. (*Id.*) Plaintiff was also making involuntary movements of his arms and head, and emitting a strange scream. (*Id.*) Deputy Walker then grabbed Plaintiff's shirt and supported his head. (*Id.*) Video capturing part of the incident shows that that a second officer arrived less than a minute after Deputy Walker left the work station, with Defendant Sgt. Olejnik arriving 23 seconds later. Defendants Nurse Scheiman and Nurse King arrive slightly more than 2 minutes after Deputy Walker first left the workstation to attend to Plaintiff, approximately 2:04 p.m. (*Id.*)

Sgt. Olejnik, Deputy Zuehlke, and Lt. Biondo all assisted to try to control Plaintiff, who was seizing and thrashing about. (Dkt. # 65-23.) According to the relevant nurse notes, Nurse Schieman tried without success to bring Plaintiff out of his seizure using ammonia, and was unable to take his vitals because of his violent thrashing. (Dkt. # 65-25.) Nurse Schieman decided that Plaintiff should be transported to the hospital by ambulance, and one arrived at the jail at 2:15 p.m. (Dkt. # 65-23.) The deputies helped Tri Hospital EMS personnel place Plaintiff on a stretcher, and he was transported to the hospital. (Dkt. # 66-51.)

Plaintiff was then diagnosed with a subarachnoid bleed in his brain. He was hospitalized for a few weeks, lapsed into a coma, had surgery to relieve the pressure on

his brain, experienced renal failure, and underwent additional surgery on his arm for compartment syndrome. (Dkt. # 65, Pg. ID 692-93; DKt. # 80, Pg. ID 1822-23.)

## II.  STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted).

In evaluating a summary judgment motion, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). To do so, the evidence must amount to more than a "scintilla." *Id.* ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."). However, if that threshold is reached, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial . . . credibility judgments and weighing of the evidence

are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal

quotation marks and citations omitted).

### III. DISCUSSION

Defendants argue that the individual officers are entitled to qualified immunity.

The doctrine of qualified immunity shields government officials "from liability for civil

damages if their actions did not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Webb v. U.S.*, 789 F.3d 647,

659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir.

2007)). The analysis involves a two-step inquiry: (1) whether, viewing the record in the

light most favorable to Plaintiff, a constitutional right has been violated; and (2) whether

the right at issue was "clearly established" at the time. *Id.* Courts may address either

prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Moreover, Plaintiff must

show "that each [Defendant] officer, through his or her own actions, *personally* violated

[P]laintiff's rights under clearly established law. *Johnson v. Moseley*, 790 F.3d 649, 653

(6th Cir. 2015) (emphasis in original) (citations omitted)). Prior courts have held that

denying or delaying anti-seizure medication for prisoners can violate the Eighth and

Fourteenth Amendments. *See, e.g.*, *Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir.

2012) (collecting cases). As a result, the court finds that this proposition was clearly

established in 2013, when Plaintiff suffered his seizures.

Where prison officials are so deliberately indifferent to the serious medical needs

of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and

unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S.

8

97, 104 (1976). Pretrial detainees are analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). To show a Fourteenth Amendment violation based on deliberate indifference, Plaintiff must prove that, objectively, McCain had "a serious medical need" and that, subjectively, each individual Defendant had "a sufficiently culpable state of mind" with respect to his condition. *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citations and internal question marks omitted).

Defendant LPNs argue that Plaintiff's need for medical care was not objectively serious. In response, Plaintiff contends the Sixth Circuit has explicitly held that two-day delay in medication for a seizure disorder is an objectively serious medical need, pointing to *Parsons*, 491 F. App'x at 602. (Dkt. # 71, Pg. ID 1164-65.) But the parties in *Parsons* did not dispute this issue, *see id.* at 601 ("The defendants do not contest that Parsons had a sufficiently serious medical need[.]"), so that court's alleged "holding" was nothing more than an assumption.

In the Sixth Circuit, "a medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (internal quotation marks omitted and emphasis removed). "[T]he seriousness of a prisoner's medical needs may also be decided by the effect of delay in treatment." *Id.* at 897. (internal quotation marks and emphasis removed).

Defendant LPNs assert that Plaintiff must place "verifying medical evidence in the record to establish the detrimental effect of the delay[,]" relying on *Napier v.*

*Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). (Dkt. # 75, Pg. ID 1654.) In

*Blackmore*, the Sixth Circuit explained that "the 'verifying medical evidence' requirement

is relevant to those claims involving minor maladies or non-obvious complaints of a

serious need for medical care." *Blackmore*, 390 F.3d at 895. "In a word, *Napier* does not

apply to medical care claims where facts show an obvious need for medical care that

laymen would readily discern as requiring prompt medical attention by competent health

care providers." *Id.*

In *Blackmore*, the significant factor was not whether the delay in treating the

plaintiff's appendicitis caused his appendix to burst, but that he complained of "sharp

and severe stomach pains for an extended period of time[,]" and vomited, "a clear

manifestation of internal physical disorder." *Id.* at 899. This created a medical need "so

obvious" that a lay person would see the need for care—and the ongoing delay

"create[d] the constitutional infirmity" regardless of the risks in delaying treatment

further. *Id.* Similarly, in *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir.

2005), the Sixth Circuit found that a prisoner displaying the "classic symptoms" of an

impending heart attack, combined with stating she was three days behind in her heart

medication, obviously demanded immediate treatment and "satisfied the objective

requirement." *Id.* In an unreported case, the Sixth Circuit has also found diagnosed

paranoia and schizophrenia—requiring medication—to be obvious medical needs. *See*

*Gunther*, 561 Fed. App'x at 502.

Here, Plaintiff presented with no outward symptoms, no current prescription or

regular doctor, and made no complaints about his medication after booking. The court is

inclined to find this case is closer to the non-obvious kidney disease requiring regular

dialysis seen in *Napier* than "recurring incontinence and debilitating immobility," *Taylor v. Franklin Cnty.*, 104 Fed. App'x 531 (6th Cir. 2004); the severe stomach pain and vomiting in *Blackmore*, 390 F.3d at 899; or the "classic symptoms" of an impending heart attack seen in *Estate of Carter*, 408 F.3d at 312. However, because the court will conclude that Plaintiff does not meet the subjective prong with respect to any Defendant, it need not resolve this question.

Plaintiff must also show that each individual Defendant had a "sufficiently culpable mental state." *Johnson*, 398 F.3d at 874. The relevant question is whether each Defendant "inferred a substantial risk of harm" and "consciously disregarded that risk." *Gunther*, 561 Fed. Appx. at 502. An official's "failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)).

## A. Defendant Officers

Plaintiff argues that Defendant Officers each violated Plaintiff's Eighth Amendment rights by failing to immediately inform medical personnel of his seizure disorder and failing to immediately secure seizure medication for him. (Dkt. # 80, Pg. ID 1835-38.) Defendant Officers' motion does not dispute that a seizure disorder is an objectively serious medical need—rather, Defendant Officers argue that Plaintiff cannot show that any officer "actually perceived facts from which to infer that there was a substantial risk of harm to Plaintiff, actually drew that inference, and disregarded that risk. (Dkt. # 65, Pg. ID 696.) The court agrees.

First, with respect to Defendant Deputy Methany, the court finds that Plaintiff could only establish negligence, not deliberate indifference. The parties agree that Deputy Methany asked Plaintiff about any seizure disorder, asked Plaintiff about his medications and where he filled them, indicated Plaintiff's responses on the medical questionnaire, and deposited the form in the box for medical staff to review. The parties dispute whether this complied with the jail's written policy at the time, but there is no dispute that this was the procedure regularly followed in practice. Defendants point to abundant testimony that these forms would ordinarily be picked up regularly and reviewed shortly after. (*See* Dkt. # 65, Pg. ID 683; Dkt. # 77, Pg. ID 1679-80.) Given that the nurses normally would pick up the forms during the 11 p.m. medication pass (*id.*), Deputy Methany had no reason to believe the necessary information would not be communicated to the medical staff within the hour. In any event, the form certainly would have been with the medical staff at the beginning of the 7 a.m. Sunday shift, with plenty of time to obtain medication for Plaintiff within the 24-hour period within which Dr. Stromberg testified that he would expect medication to be secured. (Dkt. # 80-3, Pg. ID 1886.) Plaintiff points to nothing in the record to suggest that Deputy Methany inferred that this timeline would represent a substantial risk to Plaintiff's health. Put another way, nothing in the record suggests that Deputy Methany understood the situation to be an emergency that called for him to take any immediate action.

The parties dispute whether Deputy Methany's actions complied with the written policy in place in the jail at the time. Nevertheless, even assuming that Deputy Methany failed to comply with the written policy, the court finds the record can support no more than an arguable claim of negligence against Deputy Methany. The bar for deliberate

indifference, of course, is considerably higher. *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) ("Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference.") (citing *Estelle*, 429 U.S. at 105-06).

The court makes a similar finding with respect to Deputy Fleming. Deputy Fleming met with Plaintiff shortly after he was booked for classification purposes. (Dkt. # 77-13, Pg. ID 1765-66.) Deputy Fleming already knew Plaintiff had seizures from his previous stays in the jail and double-checked to ensure that the correct medication information was on the form. (*Id.*) The court finds that Deputy Fleming's actions did not demonstrate deliberate indifference—quite the opposite, he took extra steps to ensure that Plaintiff would receive the correct medication. Otherwise, for the same reasons articulated with respect to Deputy Methany, that Deputy Fleming did not immediately and independently notify the medical staff cannot show deliberate indifference. Accordingly, Defendant Officer's motion must be granted with respect to Deputy Fleming.

The motion must also be granted with respect to the remaining Defendant Officers. The "Underlying Material Facts" section of Plaintiff's amended response avers that Plaintiff "repeatedly told jail officers, including Defendant Deputies Methany, Olejnik, Rogers, Kaminsky, Kacafirek, and Fleming, as well as medical staff that he required his medication." (Dkt. # 80.) But Plaintiff points to nothing in the record to support this statement, and Plaintiff expressly "does not contest" Defendant's statement that "[a]fter Plaintiff was placed in a holding cell, there is no evidence [Plaintiff] made any follow up requests for his medication . . . . submit[ed] a medical kite[,] or fil[ed] a

13

grievance over not receiving his medication. (*Compare* Dkt. # 65, Pg. ID 687 *with* Dkt. # 80, Pg. ID 1821.) Plaintiff does point to deposition testimony in which he states that he asked one of the deputies "for [his] meds" about two hours after being booked (Dkt. # 80-6, Pg. ID 1962), but cannot identify which deputy despite knowing many by name (*Id*). From his testimony, it is not clear that he even asked a Defendant, as opposed to some other deputy. Further, this alleged request could not have been to Deputy Kaminsky, Deputy Kacafirek, or Deputy Olejnik, who did not work the relevant shift. (*See* Dkt. # 80, Pg. ID 1826-27.) The record suggests that during the booking process Plaintiff spoke only to Deputy Methany and Deputy Fleming about his seizures and medication.

Essentially, Plaintiff's scattergun theory is that because Plaintiff had a seizure disorder, everyone on duty during the time he had not received medication violated his Eighth Amendment right to be free from cruel and unusual punishment. Even assuming Plaintiff's primary contention—that each of these defendants failed to notify medical staff immediately upon learning that Plaintiff had a seizure disorder—the court finds this to be an allegation of mere negligence, not of the higher standard of deliberate indifference. Plaintiff points to nothing in the evidence to suggest that these defendants "inferred a substantial risk of harm" to Plaintiff, much less that they "consciously disregarded that risk." *See Gunther*, 561 Fed. Appx. at 502.

Further, Plaintiff does not make any kind of particularized showing with regard to these defendants. In the Sixth Circuit, "damages claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right."

*Marcillis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)) (emphasis in original). Plaintiff points to nothing in the record to show when the medical staff became aware of Plaintiff's condition and lack of medication and, consequently, nothing to show that each particular Defendant learned of the situation before the medical staff. Thus, the court is left without any way to determine whether these deputies consciously disregarded a risk to Plaintiff's health, or simply deferred to the judgment of the medical staff. Plaintiff's generalized theory of liability must fail. *Id.*

Finally, the motion must also be granted with respect to Defendant St. Clair County. A municipality may be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). For municipal liability, there must be an "affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Plaintiff contends that "St. Clair County's policy of having intake deputies relay information, or in this case simply place medical screening forms in a bin, is unconstitutional . . . . There was no adequate procedure in place to ensure that the information was timely communicated to medical staff." (Dkt. # 80, Pg. ID 1840.) Even though "§ 1983 municipal-liability jurisprudences distinguishes between 'policy' and 'custom[,]'" *Ford v. County of Grand Traverse*, 535 F.3d 483, 496 (2008), the parties do not make that distinction clear.[4] Plaintiff, for instance, contends that "Deputy Methany

---

[4] The distinction turns on how to establish the existence of an actionable policy or

did not follow the policy in place at the time that [Plaintiff] was jailed" (Dkt. # 80, Pg. ID 1818) and that under the policy in place at the time, Plaintiff "should have been immediately referred to medical for evaluation" (*Id.* at Pg. ID 1837). But when characterizing the claim against county, Plaintiff describes the challenged practice as "the unconstitutional policy of placing medical screening intake forms in a bin, as opposed to having a process that ensures the forms are timely communicated to medical personnel." (*Id.* at Pg. ID 1838.) It appears that Plaintiff's theory, then, is that the written policy required immediate referral, but Plaintiff is challenging the unwritten practice that was actually followed.

In any event, even assuming for the purposes of this motion that this process rises to the level of a "custom or usage with the force of law" for the purposes of *Monell*, 436 U.S. at 691, Plaintiff's *Monell* claim must fail. Plaintiff's claim is fundamentally that there is a custom or policy of *inaction*—that the jail policy was failing to treat a patient with a seizure disorder but without medication as an emergency. To recover under such a theory, Plaintiff must show (1) the existence of a "clear and persistent pattern" of mishandled medical emergencies for pre-arraignment detainees; (2) notice, or constructive notice of such a pattern; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force," or direct causal link, behind the constitutional violation. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

---

custom. *Compare Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) ("Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality.") *with Memphis Tenn. Area Local, Am. Posal Workers Union v City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.")

Plaintiff points to no evidence of a pattern of mishandled medical emergencies. Put another way, Plaintiff points to no evidence to show that the county's policy "meets the stringent standard of deliberate indifference" on the part of the relevant decision-makers, *Ford*, 535 F.3d at 498, rather than simply being somewhat less than ideal. As a result, Plaintiff cannot show that the custom or policy evidences deliberate indifference on the part of the county. *See Garretson*, 407 F.3d at 789; *see also Miller*, 408 F.3d at 815-16; *Esch v. Cnty. of Kent*, 2016 U.S. Dist. LEXIS 132069, *10 (W.D. Mich. Sept. 27, 2016) (granting summary judgment to county where the plaintiff did not show other instances of violations based on the alleged policy). Further, as the court has concluded that Plaintiff cannot establish that any Defendant Officer violated Plaintiff's constitutional rights, the policy itself could not have been the "moving force" behind a constitutional violation by Defendant Officers. *Tuttle*, 471 U.S. at 823.

## B.  Defendant LPNs' motion

Plaintiff does not challenge the adequacy of the care provided by the nurses in response to his seizures. Instead, Plaintiff contends that Defendant LPNs' failure to secure medication before he suffered his seizures constituted deliberate indifference. (Dkt. # 71, Pg. ID 1165.)

The record is substantially underdeveloped with respect to the conduct of Defendant LPNs. It is unknown when the medical intake form reached the nurses and when it was first reviewed. The record does not establish which nurse was on duty for the 7 a.m. to 7 p.m. shift on Sunday, March 3,[5] or whether someone attempted to verify Plaintiff's medications before he suffered his first seizure on Monday morning. Plaintiff

---

[5] During oral argument, defense counsel indicated that the nurse on duty for the day shift on Sunday is known, but is not named as a party.

contends that no nurse attempted to verify Plaintiff's medication before he suffered a seizure, and no doctor was consulted until after Plaintiff's second seizure. (Dkt. # 80, Pg. ID 1821.) Given the absence of evidence in the record to the contrary, the court finds these to be reasonable inferences from the evidence in the record that the court must make for the purposes of this motion. *See Sagan*, 342 F.3d at 497.

Plaintiff contends that Nurse Schieman "was on-duty Sunday, March 3, 2013, after Nurse Bishop, working the 7 a.m. to 7 p.m. shifts March 3 and 4." (Dkt. # 71, Pg. ID 1149.) But in the deposition testimony Plaintiff relies on in support, Nurse Schieman testifies only that she worked on the 4th and did not know who worked on the 3rd. (Dkt. # 71-3, Pg. ID 1260.) Plaintiff points to nothing in the record that actually supports his claim that Nurse Schieman worked on the 3rd.

Nurse Schieman's shift on March 4 did not begin until 7 a.m., after Plaintiff had experienced his first seizure and after Nurse Bishop had ordered his anti-seizure medication. Nurse Schieman responded to Plaintiff's second seizure—the only one she was present for—provided supportive care, conducted a limited evaluation, and an ambulance was called shortly after. The court concludes that there is no genuine dispute of fact material to whether Nurse Schieman was deliberately indifferent or grossly negligent with respect to Plaintiff's medical needs—she provided care that could not reasonably be found to be "so cursory or inadequate as to amount to no treatment at all"—therefore summary judgment is appropriate. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (citation omitted).

Defendant LPNs' motion must also be granted with respect to Nurse King. Plaintiff argues only that Nurse King "knew that [Plaintiff] had suffered a seizure in the

morning before her shift stared on March 4 . . . . [,] knew . . . that [Plaintiff] had not received any seizure medication since he was booked on March 2, . . . [and] admitted that she was familiar with seizures and knows that they can pose a life[-]threatening condition." (Dkt. # 71, Pg. ID 1172.) But as Plaintiff acknowledges, Plaintiff's medication was ordered before Nurse King even began her shift, and Nurse Schieman was providing treatment in response to the second seizure before Nurse King arrived on the scene. It is not clear what more Plaintiff believes Nurse King was constitutionally obliged to do, but the evidence in the record, viewed in the light most favorable to Plaintiff, does not support Plaintiff's overblown contention that "the 'care' that Nurse King provided was grossly substandard so as to be reckless." (*Id.*) As a result, the court must grant Defendant LPNs' motion with respect to Nurse King.

Nurse Bishop was the nurse on duty at the time Plaintiff was jailed and worked the 7 p.m. to 7 a.m. shift from March 3 to March 4, when Plaintiff suffered his first seizure. Nurse Bishop testified that she could not recall whether she ever actually received the form. (Dkt. # 63, Pg. ID 414.) Plaintiff argues that "Nurse Bishop clearly received [Plaintiff's] Medical Screening Form filled out by the Assessment officer, but simply chose to ignore it." (Dkt. # 71, Pg. ID 1168.)

Plaintiff's contention relies entirely on the nurses' testimony that the standard practice was to pick the forms up multiple times per shift, including during medication passes, and that Nurse Bishop testified she would have done medication passes at 11 p.m. and 5 a.m. (Dkt. # 71-2, Pg. ID 1226.) From the mere existence of this practice, Plaintiff seeks to prove that Nurse Bishop actually collected the form and, after collecting it, read it; understood that Plaintiff would be missing doses and the risks that

19

posed; and decided to take no action. While this evidence of routine or standard practice would be admissible to show that Nurse Bishop picked up the form under FRE 406(b), courts "distinguish[] the *admissibility* of evidence from its *sufficiency*" for the purposes of a motion for summary judgment. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011) ("Even where an expert's evidence is ruled admissible under the *Daubert* standards, a district court remains free to decide that the evidence amounts to no more than a mere scintilla. In that case, the court remains free to grant summary judgment.") (internal citation omitted) (emphases in original). The court "draws all reasonable inferences" in Plaintiff's favor, *Sagan*, 342 F.3d at 497, but not all inferences are *reasonable*—particularly not where, as here, the court is asked to draw a series of inferences from a sliver of evidence far removed from the substantive issue. *Cf. Hamm v. City of Gahanna, Ohio*, 109 Fed. App'x 744, 748-49 (6th Cir. 2004) (affirming grant of summary judgment and finding that residents' statements to planning commission and city council were no more than a scintilla of evidence of discriminatory intent in zoning decision); *Jackson v. Agency for Persons with Disabilities Flordia*, 608 Fed. App'x 740, 743-44 (7th Cir. 2015) (finding mere fact that plaintiff's termination was close in time to eye surgery was "no more than a 'scintilla' of evidence" to find former employer's proffered legitimate reason pretextual). The court finds that the evidence Nurse Bishop actually collected and read the form—and therefore knew about Plaintiff's condition the night he was booked—amounts to no more than a scintilla and, therefore, is insufficient to support Plaintiff's claim. *See Anderson*, 477 U.S. at 252.

 Even assuming that Nurse Bishop did know that Plaintiff had a seizure condition, had last taken Tegretol at 4 p.m., and would not receive his medication until the

afternoon of June 4th, Nurse Bishop testified she would not have been concerned. (Dkt. # 71-2, Pg. ID 1229.) Nurse Bishop's understanding was that most seizure medications, including Tergetol, worked by reaching and maintaining a "therapeutic level" in the patient's bloodstream, and because Plaintiff had taken his medication that evening, she would not expect his level to drop below therapeutic before Monday. (*Id.* at Pg. ID 1223.) She also testified that she would not be concerned even after he had suffered one seizure. (*Id.* at Pg. ID 1238.) Nurse Schieman agreed with this contention, explaining that "people have seizures all the time" and that his screening form indicated that "he had medication Saturday at 4:00 and he would have been fine until Monday when he got his medication." (Dkt. # 63, Pg. ID 579.) Nurse King concurred. (*Id.* at Pg. ID 606.)

Thus, evidence in the record suggests that Nurse Bishop did not in fact perceive a substantial risk to Plaintiff's health from a two-day delay in receiving his medication, even if she had known about his seizure disorder and lack of medication. Plaintiff repeatedly claims that all three LPN Defendants knew "that not getting seizure medication to someone with a seizure disorder can cause the onset of seizures and lead to harm." (Dkt. # 71, Pg. ID 1165.) With respect to Nurse Bishop, Plaintiff asserts that "Nurse Bishop admitted that she knew that a seizure disorder is a serious condition, and that suddenly stopping the medication is not recommended and can lead to the onset of a seizure." (*Id.* at Pg. ID 1169.) But Plaintiff once again provides no citation to the record to support this assertion.[6] (*Id.*) And, as discussed above, Nurse Bishop

---

[6] Here and elsewhere in his briefings, Plaintiff makes factual claims without any citation to the record for support. The court has no obligation to search the record beyond where the parties cite. *See* Fed. R. Civ. P. 56(c)(3). As the Seventh Circuit has

testified she would not be concerned about Plaintiff missing a couple of doses, or having his medication delayed by two days, because she would not expect his medication to drop below the therapeutic level. (Dkt. # 71-2, Pg. ID 1226.) Nurse Bishop and her co-defendants may well have been wrong about this, and about the risks such an interruption may have posed to Plaintiff's health, but "failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Perez*, 466 F.3d at 423 (citation omitted).

It is helpful to contrast the record here with a similar case. *See Bays v. Montmorency Cnty.*, 2016 WL 6777850 (E.D. Mich. November 16, 2016) (Cleland, J.). The plaintiff in *Bays* complained of severe mental health issues. *Id.* In denying the jail nurse's summary judgment, this court discussed the variety of circumstantial evidence in the record that suggested the nurse in fact inferred and disregarded a substantial risk of harm. *Id.* at *5. In particular, the court pointed out that the deceased inmate had repeatedly sought out treatment for his severe mental health issues, had seen the defendant four times in ten days, and the nurse's notes described the decedent's stated symptoms in detail. *Id.* The nurse had repeatedly asked the decedent if he was suicidal, testified that she had believed he should be watched closely, and twice called to schedule an earlier appointment. *Id.* This evidence created a jury question as to whether the nurse was aware of a serious need for relatively immediate treatment. *Id.* The court also held a reasonable jury could conclude that the nurse consciously

explained, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). Where the court notes that Plaintiff has failed to cite to support in the record, the court concludes that no such support exists. *See* Fed. R. Civ. P. 56(e).

disregarded that risk by giving the decedent Benadryl and going home for the weekend without communicating the nature or severity of his condition to anyone. *Id.* at *7.

Unlike in *Bays*, Plaintiff points to no more than a scintilla of evidence that Nurse Bishop was aware of his medical condition. Even assuming that she had been aware, Plaintiff points to nothing in the record to contradict her statements, echoed by Nurse Schieman and Nurse King, that she would not have believed there to be a substantial risk to Plaintiff's health. Plaintiff points to no circumstantial evidence to show that any risk of harm to Plaintiff would have been obvious to Defendant LPNs to counter their testimony that they were or would have been unconcerned, unlike the plaintiffs in *Parsons. See* 491 Fed. App'x at 603-04. For instance, Plaintiff points to no evidence that Defendant LPNs, or LPNs generally, would have learned about these risks in the course of getting their degrees or training. Nor does Plaintiff point to evidence that Nurse Bishop or other Defendant LPNs had encountered problems arising from delays in anti-seizure medication in the past, with Plaintiff or anyone else. Thus, Plaintiff fails to show that whether Nurse Bishop had a sufficiently culpable mental state is in genuine dispute requiring submission to a jury. *Johnson*, 398 F.3d at 874.

Undisputed facts in the record show that Plaintiff was admitted without a valid, active prescription, that his medication was not kept in stock at the jail, that Plaintiff regularly went long periods without taking his seizure medication, and that Plaintiff sometimes suffers seizures even when he is on his medication. Plaintiff did not seek out medical treatment or file a grievance. Given that Plaintiff was jailed late on a Saturday evening, gave inaccurate pharmacy information, and that no doctor was present at the facility, Nurse Bishop would likely not have been able to verify his prescription to secure

23

medication even if she did receive the screening form. Even if a nurse had been able to verify his prescription, unless she decided to go through the emergency room, Plaintiff would not have gotten his medications until Monday afternoon, which would have been after he suffered his seizures. (Dkt. # 63, Pg. ID 416.)

Plaintiff's seizures were tragic, and conceivably may have been preventable had Defendants acted with greater care or competence. But that alone does not, and cannot, show that Defendants were *deliberately* indifferent towards Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments. As a result, Defendants are entitled to summary judgment.

### C. Gross Negligence

To recover for gross negligence under Michigan law, Plaintiff must show "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws 691.1407(2)(c). For the same reasons discussed above, the court concludes no reasonable jury could find that any Defendant's actions amounted to a "willful disregard of of precautions or measures to attend to safety and a singular disregard for substantial risks[,]" *Tarlea v. Crabtree*, 263 Mich. App. 80 (2004). Accordingly the court will grant Defendants' motions on this count as well.

### IV. CONCLUSION

IT IS ORDERED that Defendants' motions for summary judgment (Dkt. ## 63, 65) are GRANTED.

s/Robert H. Cleland                              /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 27, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 27, 2017, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\16-10112.MCCAIN.summary.judgments.grant.TLH4.docx